IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | )<br>)<br>) | |
| vs. | )<br>) | Criminal No. 04-37 (Erie) |
| GERALD C. DEIMEL,<br>Defendant. | )<br>)<br>) | |

**POSITION OF DEFENDANT WITH RESPECT TO PRE-SENTENCE REPORT**

AND NOW, comes the Defendant, Gerald C. Deimel, by and through counsel, Elliot J. Segel, Esquire, and files the present pleading pursuant to the Local Rules of this Court, and in support thereof avers the following:

1. On July 14, 2005, the Defendant pled guilty to Count 01, Health Care Fraud, in violation of 18 U.S.C. §1347 and 2. This plea was entered pursuant to a written Plea Agreement with the Government, which was made part of the record of the Change of Plea Proceeding.

2. At the time of his plea, this Court set October 26, 2005 as the time set for the sentencing proceeding to be held in this matter.

3. On September 20, 2005, defense counsel received a copy of the Pre-Sentence Report filed in this matter by the United States Probation Office.

4. The Defendant and undersigned counsel have discussed contents of said Pre-Sentence Report, and as a result can advise this Court that the Defendant is in agreement with most of the contents of the Pre-Sentence Report with the exception of many of the matters set forth in "The Offense Conduct" section of the report, Paragraph Nos. 6-29 of the report. By way of further statement, the Defendant advises that he is in agreement with the following features of the Pre-Sentence Report:

      A.      The Defendant agrees with the calculations performed under the 1998 United States Sentencing Guidelines, which are advisory in nature, only. As such, the Defendant agrees that under such advisory guidelines, his total offense level is 13, his criminal history category is I, yielding an advisory sentencing guideline range of 12 to 18 months of incarceration.

      B.      The Defendant has no objection to the assertion that the Foundry Group Trust (FGT) sustained a loss of $90,071.81 as a result of the conduct which was participated in by the Defendant. The Defendant accepts responsibility for restitution in that amount.

      C.      The Defendant is in agreement that per statute (18 U.S.C. § 3561[c][1]) he is eligible for probation ranging from one to five years of supervision. He further agrees that he would not be eligible for probation under the United States Sentencing Guidelines, which again are only advisory in nature.

5.      The Defendant does disagree, however, with Paragraph No. 105 of the Pre-Sentence Report which offers the opinion that the probation officer who prepared the report has no information that would warrant a downward departure from the United States Sentencing Guidelines sentencing range mentioned above. In light of <u>United States v. Booker</u>, 125 S. Ct. 738 (2005), the United States Sentencing Guidelines are merely advisory in nature, and the limiting concept of the downward departure scheme set forth in those Guidelines has thus been rendered suspect. Nonetheless, the Defendant will contend that even under said Guidelines,

there are factors which would warrant a downward departure. Because of the effect of <u>Booker</u>, "downward departures" will be the subject of a separate sentencing memorandum to be filed with this Court by the Defendant.

6.     The purpose of the remainder of this pleading is to set forth the Defendant's disagreement with and/or objections to a number of the paragraphs set forth in "The Offense Conduct" portion of the Pre-Sentence Report. Preliminarily, the Defendant would specifically note that the Pre-Sentence Report makes clear, at Paragraph No. 6, that the only source for the information contained in this portion of the Pre-Sentence Report came from the Government. While the objections noted below take nothing away from the factual basis to which the Defendant admitted and pled, and from his acceptance of responsibility for same, these objections will be relevant for sentencing purposes. The objections will be set forth below in successive paragraphs, with numbers which correspond to the specific paragraph numbers of the Pre-Sentence Report for which each objection is made.

## SPECIFIC OBJECTIONS

8.     This paragraph serves notice of the one consistent, but glaringly flawed theme of the Government's perspective that has dominated its prosecution of this case --- namely the erroneous notion that the entities involved in this health care fraud prosecution were created, operated, supervised and otherwise manipulated solely by Mr. Deimel. While Mr. Deimel has accepted *his* responsibility for *his* role, this spin by the Government ignores the truth that at least one other individual, Attorney David Keck of Fairview, Pennsylvania --- whom the Government never charged --- shares joint responsibility with Mr. Deimel for the conduct underlying the Indictment in this case. The defense will contend that this is a factor relevant for Mr. Deimel's

sentencing. For purposes of paragraph #8, the Foundryman's Group Trust Workers' Compensation Fund (FGT) was created in 1995 by Mr. Deimel *and* Mr. Keck, the latter who in fact was not only a practicing attorney, but also a former business partner of Mr. Deimel.

11.    WCCI was the company created to serve as the administrator for the FG Trust, and Mr. Deimel was the operating manager of WCCI. However, WCCI was not created and controlled solely by Mr. Deimel, as alleged in the Pre-Sentence Report through the Government's information. Attorney Keck was a 50% owner of WCCI, the other 50% owned by Mr. Deimel. Attorney Keck received 50% of all the profits obtained from its business with the FG Trust. Attorney Keck incorporated WCCI. Attorney Keck wrote the Trust Administrator Agreement, which governed the relationship with and responsibilities of WCCI towards the FG Trust. Attorney Keck wrote the Trust Agreement governing membership in the FG Trust. Attorney Keck wrote FG Trust's Trust By-Laws. Attorney Keck obtained state approval for the FG Trust start-up. Attorney Keck volunteered to be, and was approved by the FG Trust Board to be that Board's solicitor, even though that constituted a conflict of interest as respects his 50% ownership in WCCI. Attorney Keck negotiated the ten year payment contract that WCCI obtained from FG Trust. Attorney Keck did and/or had the tax returns for WCCI prepared every year with a tax preparer he selected, and who, unbeknownst to Mr. Deimel, had his Pennsylvania CPA license suspended for disciplinary reasons. Attorney Keck maintained all of WCCI's corporate and tax records at his own office in Fairview, PA. Attorney Keck had signature power for all WCCI bank accounts. Also, all policies and management decisions concerning WCCI's administration of the FG Trust accounts were taken only after notice to and approval by Attorney Keck.

12. This paragraph alleges that PCA, the claims service company that processed the workers' compensation claims filed with FG Trust, was supposedly supervised by Keck, but in reality created and largely controlled by Mr. Deimel. This is more fiction than even the preceding allegation. Attorney Keck was 100% owner of PCA. Attorney Keck received all the profits obtained by PCA's business with FG Trust. Attorney Keck incorporated PCA. Attorney Keck obtained state approval to operate PCA as a claims service company. Attorney Keck hired the only employees who ever worked at PCA. The Fairview P.O. Box address for PCA was the address for Attorney Keck's law practice. Attorney Keck operated and/or oversaw the day-to-day operations of PCA. Attorney Keck had signature power on all PCA bank accounts. Attorney Keck negotiated the ten year payment agreement PCA obtained from the FG Trust. As with WCCI, he was responsible for all the tax returns filed by PCA, and maintained PCA's corporate and tax records at his Fairview office

14. This paragraph, per the Government's claims, alleges that Comp RP, the company charged to perform re-pricing services for FG Trust, was supposedly owned and operated by the wives of Attorney Keck and Mr. Deimel, but in reality was created and controlled by Mr. Deimel. Again, the Government has ignored the truth of this matter. Comp RP was created by Attorney Keck, and he set his wife up as the company's president. The Kecks had 50% ownership of the company, and received 50% of the income obtained by it. Company was incorporated by Attorney Keck. Attorney Keck had signature power for the Comp RP bank accounts. Attorney Keck had all Comp RP documents and statements sent to his Fairview office address. The policies and operating procedures for Comp RP's procedures and billings were all discussed with and approved by Attorney Keck. Attorney Keck was responsible for all tax returns filed by Comp RP, and maintained the company's corporate and tax records at his

Fairview office. Both Attorney Keck and Mr. Deimel made the disclosures about Comp RP to the FG Trust Board. Also, it is true that the Board was advised that a sophisticated computer software program had been purchased to perform the re-pricing functions, but said program was actually selected and purchased by Attorney Keck, through PCA.

17. It is true that Mr. Deimel had signatory authority over the bank accounts of WCCI, FG Trust, PCA and Comp RP, but so did Attorney Keck, and Mr. Don Weil, a foundry owner and member of the FG Trust and Board officer, also had signatory authority over the FG Trust bank accounts. Moreover, all of these accounts were created so that two (2) signatures were required on all checks.

18. The Government's version here omits that at the quarterly Board meetings, Attorney Keck recorded the minutes of the meetings and was appointed and served as legal counsel (solicitor) for the Board.

22. Mr. Deimel did obtain bids for the stop-loss insurance coverage each of the years in question. He maintains the bids were high due to the high industry-wide risk ratings for foundry workplaces.

24. Here again, Comp RP was a company created by Attorney Keck, and he and his wife maintained 50% ownership of Comp RP.

25. The secretary interviewed at the time of the serving of the October 199 search warrant was the Attorney Keck's secretary, not the secretary of Mr. Deimel. She was hired by Attorney Keck and was the secretary for PCA, the company owned wholly and solely by Attorney Keck. Further, the medical bills mailed for re-pricing to Options were bills mailed there by PCA --- Attorney Keck's wholly-owned company --- not by Mr. Deimel.

26. The $35,076.06 alleged to have been overpaid to Comp RP for re-pricing was not paid solely to Mr. Deimel, as asserted. Again, Attorney Keck and his wife owned 50% of Comp RP, and they received 50% of all net income realized by that company.

29. Here again, Mr. Deimel is accepting responsibility for his conduct. The Government's version, however, is derelict in not also noting the complicity and unjust enrichment of the un-indicted Attorney Keck. For example, by virtue of his 100% ownership of PCA and he and his wife's 50% ownership in Comp RP, Attorney Keck would have received fro his personal use at least one-half of the $90,071.81 wrongfully obtained from FG Trust.

Respectfully submitted,
SEGEL & SOLYMOSI

By: _____
Elliot J. Segel, Esq.
818 State Street
Erie, PA 16501
(814) 454-1500
FAX (814) 454
Counsel for Defendant

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct of the foregoing document was served by U.S. First Class Mail upon Assistant United States Attorney James Wilson, 400 U.S. Post Office and Courthouse Building, 700 Grant Street, Pittsburgh, PA., 15219, on the 5th day of October, 2005.

_____
Elliot J. Segel, Esq.

7