**United States Department of Labor**
Employee Benefits Security Administration
PHILADELPHIA REGIONAL OFFICE
CRIMINAL CASE SUMMARY
EBSA File No. 20-007481(52)

Subject(s):	Health Claims, Inc.
2700 W. 21st Street
Erie, Pennsylvania 16506

Gerald C. Deimel
1505 South Shore Drive
Erie, Pennsylvania 16505-2437
D.O.B. October 13, 1944
SSN:  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

**Assigned Investigator: Norman Jackson, Supervisory Investigator**

I. **Predication:**

The subject case was opened on April 16, 1996 based on complaints received by the United States Department of Labor – Employee Benefits Security Administration (the "Department" or "DOL") from three separate sources. The case focused on alleged violations of 18 U.S.C. §669; §1347; and, §1035 allegedly committed against ERISA-covered employee benefit health-care programs by the subjects from 1994 through 1996.

**Prior Acts (Commonwealth of Pennsylvania):**

In 1994, Gerald C. Deimel entered into a Consent Order with the <u>Insurance Commissioner for the Commonwealth of Pennsylvania</u> (the "Commissioner") [Docket Number P94-09-048]. This Consent Order, the Commissioner charged Gerald Deimel with multiple violations of §§208, 604 and 633 of the <u>Insurance Department Act of May 27, 1921</u> (P.L. 789, No. 285 [40 P.S. §§46, 234 and 273]) and §§4 and 5(a)(2) of the <u>Unfair Insurance Practices Act of July 22, 1974</u> (P.L. 589, no. 205 [40 P.S. §§1171.4 and 1171.5]).

According to the aforementioned Consent Order, from August 1991 through September 1992, Gerald C. Deimel engaged in a variety of health care insurance scams including: false statements regarding health care insurance and licensed representatives; diversion of health insurance premiums; and, misrepresentations of those participants to be insured to both the insurance companies ands the unsured.

As a result of the Consent Order, Gerald C. Deimel's license to do insurance business in the Commonwealth of Pennsylvania was revoked. Gerald C. Deimel was also ordered to make restitution to all those persons affected by his actions.

On May 17, 1994, Article X was added to the <u>Commonwealth of Pennsylvania Insurance Department Act</u> (P.L. 789, No. 285, by Section 3 of the Act of December 12, 1994, P.L. 1035, No.

141, effective February 11, 1995). Article X of the Insurance Department Act is known and cited as the "Insurance Administrator Licensure Act."

The Insurance Administrator Licensure Act requires persons who engage in the business of third-party administration of employee benefit health plans to: (i) register an application to conduct such business in the Commonwealth of Pennsylvania; (ii) be issued a license to engage in such activity from the Commonwealth of Pennsylvania; (iii) meet minimum financial responsibility and security requirements; and (iv) maintain proper books and records that are to be available for inspection by representatives from the Commonwealth of Pennsylvania.

According to the Insurance Administrator Licensure Act, failure to hold such a license shall subject the administrator to a civil penalty of not less than one thousand dollars ($1,000) nor more than five thousand dollars ($5,000) for each instance of unlicensed activity. After a notice and a hearing, the Commissioner of Insurance for the Commonwealth of Pennsylvania may do any more or more of the following:

   1. Suspend, revoke or refuse top renew the license of an administrator

   2. Impose a civil penalty on an administrator of not more than five thousand dollars ($5,000) for each violation;

   3. Order restitution upon finding that the administrator violated any of the requirements of the Insurance Administrator Licensure Act or regulations or the administrator is not competent, trustworthy, financially responsible or of good personal and business reputation.

According to Victor N. DiCicco, Chief of the Commonwealth of Pennsylvania Department of Insurance, and Christopher R. Monahan, Field Investigator for the Commonwealth of Pennsylvania, Department of Insurance, Gerald C. Deimel had knowledge of the Insurance Administrator Licensure Act because Messrs. DiCicco and Monahan specifically told Gerald Deimel of this law when his license to sell insurance products in the Commonwealth of Pennsylvania was to be revoked.

Messrs. DiCicco and Monahan disclosed, upon a review of their records, Gerald C. Deimel and Health Claims, Inc. failed to register as a third party administrator as required by the Insurance Administrator Licensure Act. Furthermore, Messrs. DiCicco and Monahan informed Gerald C. Deimel, due to his loss of license to sell insurance, it would be unlikely either Gerald C. Deimel or Health Claims, Inc. would be issued a license as a third party administrator from the Commonwealth of Pennsylvania.


II. **The Department's case – an Overview:**

Pursuant to the subject investigation, the DOL found, from 1994 through 1996, Gerald C. Deimel ("Deimel") and Health Claims, Inc. ("HCI" or the "Company") provided third-party administrative services to twenty-seven ERISA-covered employee benefit health-care benefit programs.

2

The Department's review disclosed these twenty-seven ERISA-covered employee benefit plans were generally sponsored by small to medium-sized companies primarily located in central and western Pennsylvania.

Pursuant to contractual agreements between these ERISA-covered clients and HCI, the Company was to provide these health-care programs with the services they needed to operate self-funded ERISA-covered health and welfare plans. Pursuant to a contractual agreement, HCI was to perform the following services to these twenty-seven ERISA-covered plans:

1. provide the plan documents, summary plan description and other information describing the plan to the client and the client's employees;

2. administer the client's health plan based on eligibility lists provided to them by the client;

3. place stop-loss insurance for the client (both specific and aggregate) and act as the agent for the client's insurance needs;

4. adjudicate health-care claims for the client;

5. Provide an outstanding claim report to the client for funding purposes;

6. provide a check register to the client revealing those claims that have been paid.

Generally, these twenty-seven ERISA-covered self-funded health care benefit plans were funded through the use of employee payroll deductions, as well as employer contributions as considered necessary.

Of HCI's twenty-seven ERISA-covered health care plan clients, during our investigation, the DOL was able to ascertain that the plan sponsors and/or the participants of at least eleven ERISA-covered health benefit programs were harmed in their relationship with Gerald C. Deimel and HCI as provided below:

| | | |
|---|---|---|
| 1. | L.G. Hetager, Inc. | $100,881.60 |
| 2. | Butler Country Club | 132,549.96 |
| 3. | Team Transport | 60,112.35 |
| 4. | Marburger Farm Dairy | 42,630.32 |
| 5. | Good Tire Service | 8,931.60 |
| 6. | MHF, Inc. | 8,121.16 |
| 7. | Lewistown Cabinet Center | 3,400.00 |
| 8. | Phil Fitts Ford | 2,200.00 |
| 9. | Consolidated Steel Services | 1,900.00 |
| 10. | Straub Brewing Company | 1,000.00 |
| 11. | Thermoclad, Inc. | 833.00 |
| 12. | Health Care Stratgies, Inc. | 950.40 |
| | Total | $363,610.39 |

It is alleged that this harm consisted of intentional acts perpetrated by Gerald C. Deimel and HCI which may be considered alleged violations of 18 U.SC. §664 (Theft or Embezzlement from an employee benefit plan); 18 U.S.C. §1027 (False Statements and Concealment of Facts in Relation to Documents Required by the Employee Retirement Income Security Act of 1974); 18 U.S.C. §371 (Conspiracy to Commit an Offense or to Defraud the United States); 18 U.S.C. §1341 (Frauds and Swindles); 18 U.S.C. §1347 Health Care Fraud); 18 U.S.C. §669 (Theft and Embezzlement in connection with health care); and, 18 U.S.C. §1035 (False Statements relating to health care matters).

A summary of the specific actions taken by Gerald C. Deimel and HCI are detailed, in part, below:

1. **L.G. Hetager Drilling, Inc. Group Health Plan**

   L.G. Hetager Drilling, Inc. (the "Company") was located at R.D. 1, Box 16 in Punxsutawney, Pennsylvania 15767.

   The officers of the Company were: LeRoy G. Hetager (President); Rollin Garhart (Vice President); and, Kevin Wildeson (Secretary/Treasurer).

   The L.G. Hetager, Inc. Group Health Plan (the "Plan") was established by LeRoy G. Hetager as a self-insured ERISA-covered employee welfare benefit plan to provide medical benefits to those persons employed by L.G. Hetager Drilling, Inc. as well as the dependents of those employees.

   The administrator of the Plan was the Company.

   The trustee of the Plan was LeRoy G. Hetager.

   According to those instruments governing the operation of the Plan, the "Plan Supervisor" was HCI.

   The Plan entered into a contractual relationship with HCI in early 1991.

   From March 1, 1991 through February 28, 1996, the Company entered into an Administrative and Claims Agreement with HCI for the providence of administrative and claims services for the Plan.

   As a self-insured health benefit plan, HCI placed the Plan's specific and aggregate stop-loss insurance with the Clarendon National Insurance Company ("Clarendon") as provided through KCS Management Services, Inc. ("KCS") a managed group underwriter located in the state of Florida.

   On March 23, 1995, the Company sent Gerald C. Deimel check number 12855 in the amount of $700.00 for the providence of administrative and claims services for the Plan.

   On March 26, 1995, Eric Duane Brown, an employee of the Company, and a participant in the Plan, was seriously injured in an automobile accident.

   Mr. Brown's accident rendered him disabled and substantial medical bills were incurred by the Plan.

As a result of Brown's disability, Brown was terminated by the Company and issued a COBRA notice. Brown elected the COBRA coverage provided under the Plan.

On April 12, 1995, Kevin Wildeson wrote Company check number 12952 to HCI in the amount of $3,177.69. This check represented the Plan's stop-loss insurance premium. The Company's check was endorsed by HCI on April 18, 1995.

On June 7, 1995, HCI representatives sent Kevin Wildeson a fax informing the Company that they have received Plan medical bills for Eric D. Brown that exceed the Plan's $10,000.00 specific stop-loss limits. However, HCI could not submit the Plan's medical claims to the insurance carrier until the Plan becomes current with their insurance premiums. The HCI fax requested a payment from the Plan in the amount of $7,967.38 for May and June so HCI cold submit Eric Brown's claim to the Plan's stop-loss insurance carrier.

On June 8, 1995, Wildeson wrote Company check number 13190 to HCI in the amount of $2,629.69 representing the Plan's May stop-loss premium. The Company's check was endorsed by HCI on June 9, 1995.

On June 20, 1995, Wildeson wrote Company check number 13250 to HCI in the amount of $5,337.69 representing the Plan's June stop-loss premium. The Company's check was endorsed by HCI on June 22, 1995.

On August 23, 1995, Wildeson wrote Company check number 13469 to HCI in the amount of $7,816.36 representing the Plan's July stop-loss insurance premium ($3,994.18) and August stop-loss premium ($3,822.18). The Company's check was endorsed by HCI on August 25, 1995.

From April through August 1995, while the Company made payments to HCI totaling $18,961.43, according to KCS, the following stop-loss insurance premium payments were actually received from HCI for the Plan:

> On 05/09/05 $2,868.75 was received for the premium due on 03/01/95
> On 07/12/05 $3,065.41 was received for the premium due on 04/01/95
> On 08/29/05 $3,065.41 was received for the premium due on 05/01/95
> On 08/29/05 $3,065.41 was received for the premium due on 06/01/95
>
> Total       $12,064.98

Representatives for KCS informed the Department the Plan's payment patterns were considered "highly unusual". In fact, representatives from KCS repeatedly contacted Gerald C. Deimel, as the Plan's authorized representative, regarding these unusual payment patterns.

On November 15, 1995, KCS representatives informed Gerald C. Deimel that the Plan's stop-loss insurance contract was terminated by Clarendon due to the non-payment of its premiums. The effective date of Clarendon's termination notice was June 30, 1995.

As a result of the Plan's cancellation of stop-loss insurance, the Plan was not able to pay Eric Brown's medical bills. As of May 31, 1995, Eric Brown had medical invoices totaling over $63,000.00.

According to Eric Brown, due to the Plan's failure to pay his medical bills, he is faced with constant calls from collection agencies seeking payment directly from him. Eric Brown's credit rating, once outstanding, has now been destroyed. Further, any hope that Eric Brown and his wife had for buying a home for themselves and their children are now gone.

The Department has calculated losses to the Plan and the Plan's participants in their relationship with Gerald C. Deimel and HCI to be $100,881.60 exclusive of any fees from attorneys or collection agencies that may be the responsibility of the Plan, the Company, or the Plan's participants and their beneficiaries.

2. **The Good Tire Service, Inc. Premium Only Plan**

   Good Tire Service, Inc. ("GTS") and PGT Retreading, Inc. ("PGT") are two separate companies operating under a common ownership interest (collectively referred to as the "Company").

   The Company is located at 401 South Water Street, Kittanning, Pennsylvania 16201.

   Denton Good is the sole owner of GTS.

   The owners of PGT are: Denton Good (42.50%); John Marone (30.00%); and, Jack Conte (27.50%).

   The officers of GTS are: Denton Good (President); Jack Conte (Vice President); and, Rose Hornburger (Secretary/Treasurer).

   The officers of PGT are: John Marone (President): Jack Conte (Vice President); and, Denton Good (Secretary/Treasurer).

   The Good Tire Service, Inc. Premium Only Plan (the "Plan") was established on January 1, 1993 as an ERISA-covered self-funded health and welfare fund. The Plan was established to provide medical benefits to eligible employees of the Company and their dependents.

   Employees of the Company contribute to the cost of the Plan's benefits through automatic payroll deductions earmarked from their periodic salary.

   From 1991 through 1995, approximately thirty-three percent of the cost of the plan was born by the Company's employees.

   The administrator of the Plan was the Company.

   According to those instruments governing the operation of the Plan, the "Plan Supervisor" was HCI.

   From December 1, 1991 through December 1, 1995, the Company entered into an Administrative and Claims Agreement with HCI for the providence of administrative and claims services for the Plan.

As a self-insured health benefit plan, HCI placed the Plan's specific and aggregate stop-loss insurance with Connecticut General Life Insurance Company ("CG") as provided through American Insurance Managers, Inc. ("AIM") a managed group underwriter located in Atlanta, Georgia.

During the Plan's contract with HCI it was revealed, while the Company was remitted its claims payments on time, HCI, failed to pay those practitioners who provided health care benefits to the plan's participants and their beneficiaries. HCI's non-payment for these provided services resulted in numerous calls to Plan participants from various collection agencies demanding payment for those covered services rendered and paid by the Plan to HCI.

The Department's investigation revealed, among other damages, the following Plan participants paid monies that the Company provided payment to HCI and should have been covered by the Plan:

| | |
|---|---:|
| Emily Louise Marshall | $6,675.93 |
| Robert Wertz | 144.00 |
| Timothy Wolfe | 267.92 |
| Matthew Attinger | 39.00 |
| Mary Ann Kotch | 14.75 |
| George Knapp | 76.80 |
| John Morrone | 327.20 |
| Thomas Byers | 123.00 |
| Douglas Pfeiffer | 32.00 |
| Total | $7,739.60 |

3. **Emeryville Trucking, Inc. Flexible Benefits Plan**

   Emeryville Trucking, Inc. is owned and operated by a Pennsylvania-based closely-held corporation known as Team Transport, Inc. ("Team Transport" or the "Company").

   The Company is located at 919 Brush Creek Road, Warrendale, Pennsylvania 15086.

   The shareholders of Team Transport are: Phillip Rezzetano (50%) and John Rezzetano (50%).

   The owners of the Company are: Dru Rezzetano (President) and Pamela Rezzetano (Secretary/Treasurer).

   The Emeryville Trucking, Inc. Flexible Benefits Plan (the "Plan") was established on July 1, 1993 as an ERISA-covered self-funded health and welfare fund. The Plan was established to provide medical benefits to eligible employees of the Company and their dependents.

   The administrator of the Plan was the Company.

   The trustee of the Plan was Phillip Rezzetano.

According to those instruments governing the operation of the Plan, the "Plan Supervisor" was HCI.

From July 1, 1993 through May 1, 1996, the Company entered into an Administrative and Claims Agreement with HCI for the providence of administrative and claims services for the Plan.

As a self-insured health benefit plan, HCI placed the Plan's specific and aggregate stop-loss insurance with Connecticut General Life Insurance Company ("CG") as provided through American Insurance Managers, Inc. ("AIM") a managed group underwriter located in Atlanta, Georgia.

On March 29, 1996, Phillip Rezzetano was informed, although the Plan paid their stop-loss insurance protection for the month of February 1996 through a check that was endorsed by HCI on January 22, 1996, the Plan's stop-loss insurance protection was in jeopardy since HCI's check to AIM for this Plan was returned due to insufficient funds.

The Department's investigation revealed the following numerous losses were sustained by numerous parties in their relationship with the Plan and specifically with the Plan's Supervisor Gerald C. Deimel and HCI. These losses are summarized as follows:

| | |
|---|---:|
| Invoices paid by the Company twice ($ rec'd. by HCI, but not forwarded) | $46,655.67 |
| Stop-loss Insurance payments rec'd. by HCI and not forwarded | 6,591.27 |
| March 1996 Stop-loss premium Paid twice to HCI by the Plan | 4,050.51 |
| Fees to forensic accountant to detect loss due to fraud | 2,400.00 |
| Shipping fees paid by Company to move Plan's records from HCI | 72.00 |
| Outstanding service fees | 342.90 |
| Total | $60,112.35 |

On September 20, 1996 the Company filed a civil complaint against Gerald C. Deimel and HCI in the amount of $57,297.45 in Erie, Pennsylvania (Docket No. GD96-13764) on behalf of the Plan.

While Gerald C. Deimel and HCI were informed of the Plan's complaint, Gerald C. Deimel and HCI failed to answer the complaint or appear before the Court.

4. **The Butler Country Club Flexible Benefits Plan**

The Butler Country Club ("BCC" or the "Club") is located at 310 Country Club Road, Butler, Pennsylvania 16003.

BCC is a private member-owned club with an eighteen hole golf course, competitive swimming and inter-club tennis programs with meets. In addition to its recreational activities, BCC also operates a food and beverage program with banquets for up to 300 people, member dining, and private parties such as weddings and social events.

Incorporated in the Commonwealth of Pennsylvania in April 1908, the Club operates as a non-profit social club pursuant to §501(c)(7) of the Internal Revenue Code.

Richard P. Moss is the General Manager of the Club.

The Butler Country Club Flexible Benefits Plan (the "Plan") was created by Richard P. Moss to attract and retain quality employees.

The Plan was established as an ERISA-covered self-funded health and welfare fund to provide medical benefits to eligible employees of the BCC and their dependents.

Fifty-percent of the cost of the Plan was borne by the Club's employees through automatic payroll deductions.

The administrator of the Plan was the Club.

The trustee of the Plan was Richard P. Moss.

According to those instruments governing the operation of the Plan, the "Plan Supervisor" was HCI.

From March 1, 1992 through January 1996, the Company entered into an Administrative and Claims Agreement with HCI for the providence of administrative and claims services for the Plan.

As a self-insured health benefit plan, HCI placed the Plan's specific and aggregate stop-loss insurance with the Clarendon National Insurance Company ("Clarendon") as provided through KCS Management Services, Inc. ("KCS") a managed group underwriter located in the state of Florida.

Reports generated by HCI to BCC revealed that the Plan was charged by HCI for numerous duplicate charges.

Due to the frequency and the amount of these duplicate charges, Richard Moss, as the Plan's trustee, retained the services of Johnson and Higgins, Inc., ("Johnson & Higgins") an independent consulting firm, to review the HCI's administration of the Plan.

Johnson & Higgins' review of HCI found that all of HCI's client accounts, including the Plan's assets, were commingled by HCI into one large account instead of separate accounts as required in HCI's agreement with the Plan.

The Johnson & Higgins report also disclosed the following:

| | |
|---|---|
| Incorrect Claim processing resulting in Plan overpayments | $3,233.00 |
| Slow claims processing affecting the Plan's stop-loss reimbursement | 32,096.00 |
| Plan refunds rec'd. by HCI, but not credited to the Plan | 3,609.00 |
| Payments made by the Plan but not accounted for by HCI | 45,667.00 |
| Total | $84,605.00 |

In addition to the Johnson & Higgins report, Richard P. Moss also found, from February 1995 through October 1995, the Plan made numerous duplicate payments to HCI totaling $14,357.00 and $13,249.78 in stop-loss premium payments that were never forwarded by HCI to KCS.

As a result of HCI's failure to forward to Plan's stop-loss insurance premiums to KCS, unknown to Richard P. Moss, the Plan's stop-loss insurance was cancelled in August 1995 even though the Plan continued to pay stop-loss insurance premiums to HCI from August 1995 through January 1996.

On October 8, 1996, Thomas E. Breth, Esq. of <u>Dillon, McCandless, King, Coulter & Graham, LLP</u> filed a civil suit in Erie, Pennsylvania against Gerald C. Deimel and HCI on behalf of the Plan in the amount of $84,605.00.

Neither Gerald C. Deimel nor HCI appeared in a preliminary hearing scheduled on November 20, 1996.

In addition to Plan losses, participants were also required to pay $20,107.18 for medical claims that should have been covered by the Plan's relationship with HCI. Plan participants were as follows:

| | |
|---|---|
| Russell McCartney | $7,522.09 |
| Stanley Lopinsky | 9,065.54 |
| Ruth Gombos | 1,398.00 |
| Robin Fleig | 1,161.55 |
| Jeffrey Lieber | 410.00 |
| Silvestro Nicastro | 315.00 |
| William Green | 235.00 |
| Total | $20,107.18 |

In its investigation, the Department determined that the Plan and its participants lost $132,549.96 in its relationship with HCI as follows:

| | |
|---|---|
| Duplicate payments made by BCC to HCI | $14,357.00 |
| Stop-loss rec'd. by HCI but not forwarded to KCS | 13,249.78 |
| Plan losses determined by Johnson & Higgins | 84,605.00 |
| Dollars paid by Plan participants | 20,107.18 |
| Other outstanding servicing fees | 231.00 |
| Total | $132,549.96 |

### 5. The Marburger Farm Dairy, Inc. Employee Benefit Plan

Incorporated in the Commonwealth of Pennsylvania in 1958, <u>Marburger Farm Dairy, Inc.</u> ("Marburger" or the "Company") is located at R.D. 2 Evans City, Pennsylvania 16003.

10

The officers of the Company are: Margaret Marburger-Wearing (President) and James Fogle (Vice President).

The shareholders of Marburger are: Margaret Marburger-Wearing (124 shares); James Marburger (188 shares); and Rita Marburger-Reifenstein (10 shares).

The Marburger Farm Dairy, Inc. Employee Benefit Plan (the "Plan") was established on October 1, 1993 as an ERISA-covered self-funded health and welfare fund. The Plan was established to provide medical benefits to eligible employees of the Company and their dependents.

The administrator of the Plan was the Company.

The trustee of the Plan was Margaret Marburger-Wearing.

According to those instruments governing the operation of the Plan, the "Plan Supervisor" was HCI.

From October 1, 1993 through September 1, 1994, the Company entered into an Administrative and Claims Agreement with HCI for the providence of administrative and claims services for the Plan.

As a self-insured health benefit plan, HCI placed the Plan's specific and aggregate stop-loss insurance with the Gettysburg Insurance Company and the Equitable Beneficial Life Insurance Company.

During the Plan's relationship with HCI and Gerald C. Deimel, Plan officials became aware of what they believed to be an unusually long turn around time, generally, ninety days or more, between the time a Plan invoice was received bt marburger, the time the Company paid HCI, and the time the health-care provider was actually paid for those services rendered by HCI.

Due to these unusual delays in the payment of the Plan's practitioners, numerous complaints were received by the Company.

In many instances, bill collection agencies were retained by various health-care practitioners against the Plan's participants in an effort to be compensated promptly.

In addition to the slow payment of the Plan's health-care claims, Marburger also provided HCI with a payment of $18,000.00 for Plan stop-loss insurance that was never placed for the Plan by HCI. While the Company eventually received the Plan's $18,000.00 insurance premium from HCI, as a result of the non-payment for this insurance protection, the Plan unknowingly incurred $42,630.32 in additional claims that this insurance protection would have covered if this insurance protection was properly placed for the Plan by HCI as required by contract.

The Department's investigation revealed, through negotiations with the health-care practitioners, the Company was able to negotiate the off-set of the Plan's $42,630.32 in claims through the payment of $31,662.70 by the Company. Hence, health-care practitioners lost $10,967.62 through the Plan's arrangement with HCI.